STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V.
FARMERS STATE BANK OF WOOD RIVER, E. H. LUIKART,
. RECEIVER, APPELLEE: MARO D. LYHANE, INTERVENER,
APPELLANT.

FILED MAY 22, 1934. No. 28891.

*H. G. Wellensiek,* for appellant.

*F. C. Radke* and *Barlow Nye, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and
PAINE, JJ., and LANDIS, District Judge.

EBERLY, J.

The Farmers State Bank of Wood River, Nebraska, is
an insolvent institution and in charge of a receiver duly
appointed.

The appellant, Lyhane, herein designated as plaintiff,
by petition of intervention filed in the receivership, pre-
sented his claim for a trust fund against the insolvent
bank. His right thereto was challenged by the bank's
receiver, hereinafter called the defendant, and issues were
made up. Upon a hearing on the merits, plaintiff's claim
for a trust fund was disallowed, and from the order of
the trial court overruling his motion for a new trial he
appeals.

This litigation finds its source in the following transactions: In the fall of 1929, Rudolph Durtschi, M. J. McDermott, Otha Oldfather, Maro D. Lyhane, W. T. Schooley, A. E. Hauke, W. A. Francis, and F. J. Miller were the directors of the Farmers State Bank of Wood-River, and the larger stockholders therein. The bank was in need of cash, not only because of the situation created by the failure of several nearby banks, but in order to supply the demand for live stock loans made upon it by "feeders" of the territory it served. For this purpose five of the directors above named evidently "loaned their credit" to this bank in the following manner: McDermott, Oldfather, Hauke, Francis and plaintiff, Lyhane, made up a fund of $46,000, each contributing the sum of $10,000 excepting Francis who paid in the sum of $6,000. This $46,000 was paid over to the Farmers State Bank of Wood River to meet the situation confronting it.

Substantially contemporaneous with this all the directors, including Lyhane but excepting F. J. Miller, entered into an agreement in writing "on —— day of November, 1929," in contemplation of this transaction, wherein it was expressly agreed, among other provisions, that each of said parties "shall purchase from the Farmers State Bank of Wood River, Nebraska, notes, either secured or unsecured, without recourse, and pay therefor the face value thereof to such an amount as each may determine for himself and to carry said note or notes until such time as the said bank may, at its discretion, desire to repurchase the same or to purchase renewal notes, if said notes should be renewed, * * * and further agree to carry said notes until maturity or for a period of —— months. * * * It is further agreed and understood that the signing of this contract does not in any way obligate or bind the Farmers State Bank of Wood River to repurchase any of said notes and the purpose of this agreement is that each of the parties signing the same will stand an undivided one-seventh of any and all loss which may be sustained by the parties hereto through the purchase of

said notes. It is agreed that said loss shall be determined within a period of —— months from the date hereof, unless otherwise mutually agreed upon by the parties hereto."

The record supports the inference that the money thus contributed by all except Lyhane was the proceeds of real estate loans made on real estate by them severally owned. The $10,000 contributed by Lyhane was borrowed at the Packers National Bank of Omaha, Nebraska, on his individual note. As these sums were each received by the bank there was withdrawn from the bank's bills receivable "good notes" of substantially equivalent amount and placed in an envelope on which the contributor's name was inscribed. These notes were each indorsed without recourse in lead-pencil in order that upon payment or renewal the indorsement could be erased so that the fact of its having been made could be concealed.

Director Oldfather testifies that the notes thus placed "in separate pouches" were left at the bank for the cashier to look after, to collect the interest and renew, or if any of them were paid, to substitute equally as good notes (from the bank note case) as those paid. The evidence in the record indicates that the interest on all loans made by the several contributors was paid by the bank out of its own funds, but that the bank got the benefit of the interest accruing on the notes placed in the contributors' envelopes. This is certainly true as to the nonpayment of interest by the plaintiff.

There seems to have been no interruption of the intended progress of this transaction until on April 10, 1930. On that day plaintiff's note of $10,000 was in the possession of the Packers National Bank. In the envelope with his name inscribed thereon were notes substantially aggregating the amount of his note. The state examination of the bank had just been completed the day previous, and the result thereof was a requirement that $29,580.28 of the bills receivable be "charged off." Plaintiff was admittedly present for a part of the time while

this examination was being made. The evidence for the defendant tends to establish that the matter of providing for the "charge off" was submitted to him and he approved verbally substantially the following plan: That $11,120.-28 should be debited to undivided profits, and $18,460 should be taken out of the contributors' envelopes and returned to the bank. This was embodied in a report to the state under date of April 10, 1930, over the signatures of all the directors save Lyhane. In this report are schedules of the notes contributed for the purpose of making up the $18,460. It discloses that $4,610 was received from Maro D. Lyhane in eight notes which are itemized by date, name of maker, and amount. A true copy of this report continued to be a part of the records of the bank, and was made a part of the directors' minutes. The $18,460 in notes was thereupon received and regularly entered up in the bills receivable as the property of the bank. Lyhane now denies all knowledge of this transaction.

In his petition filed in the present case, plaintiff in substance alleges that he was on April 10, 1930, the owner of eight notes of the total value of $4,610, which he had previously purchased from the defendant bank, and which he had left with the bank for safe-keeping and payment; that the defendant bank without his knowledge or consent illegally converted said notes to its own use by substituting them for worthless notes of the bank which the bank examiner had directed to be eliminated from the assets of the bank; that the eight notes in suit were good and collectible, and augmented the assets of the bank in the sum of $4,610, all of which went into the possession of the receiver. Plaintiff admits a total credit of $850, which the bank is entitled to, and prays judgment for $3,750 and interest as a trust fund with priority of payment over all other creditors. The defendant's answer, in addition to a general denial, alleged that on April 10, 1930, plaintiff, intervener, contributed said notes to a common pool for the purpose of elim-

inating certain "bad paper" from the assets of the bank, and accepted his proportionate share of such "bad paper," and that he knew of this procedure and acquiesced therein. Certain other allegations were contained in the answer, to which plaintiff filed a reply. Thereafter, during the trial of the action to the court, at the suggestion of the trial judge, defendant amended his answer by incorporating therein allegations. of estoppel. The cause was thereupon, on application of plaintiff, continued for ten days to allow for filing an amended reply to the amended answer, with permission to withdraw rest. The amended reply was thereafter filed, and on the evidence received upon the issues thus made the trial court entered judgment for defendant, and dismissed plaintiff's action.

Two errors are presented on this appeal. The first for our consideration is the charge that the trial court erred in permitting the defendant to amend his answer, after plaintiff had rested, by incorporating therein the allegations of estoppel.

It will be noted that, the amendment having been made, the trial court continued the hearing ten days "with permission to withdraw rest." Conceding that estoppel, to be available as a defense, must be pleaded (*Salladin v. Mitchell*, 42 Neb. 859), still the action of the trial court in permitting the amendment complained of is not erroneous. In *Omaha & R. V. R. Co. v. Moschel*, 38 Neb. 281, we held:

"The permitting or refusing amendments to pleadings is a matter within the sound judicial discretion of the trial court; and unless it is made to clearly appear that he has abused this discretion, and a party has thereby been deprived of the opportunity to make his case or defense, the supreme court will not interfere.

"It is not necessarily a fatal objection to a proposed amendment that it is in fact an additional defense or an additional cause of action." See, also, *Dunn v. Bozarth*, 59 Neb. 244.

In order to predicate error in allowing the amendment of pleadings by the trial court, at any stage of the trial, it must be shown affirmatively that the trial court abused its discretion. *Blakeslee v. Van der Slice,* 94 Neb. 153; *Continental Supply Co. v. Syndicate Trust Co.,* 52 N. Dak. 209.

Plaintiff's rights were amply protected, so far as disclosed by the record, by the continuance of the hearing for the period of ten days, "with permission to withdraw rest." The district court therefore must be deemed to have proceeded within its discretion and without error.

The second contention of plaintiff is, in effect, that the evidence is insufficient to support the judgment.

Preliminary to a discussion of the evidence, it may be said that during all of the time occupied by the related transaction involved in this litigation plaintiff was an active and qualified director of the Farmers State Bank of Wood River. On a related subject in *Merchants Bank v. Rudolf,* 5 Neb. 527, 540, Lake, C. J., in delivering the opinion of this court, employed the following language:

"In Morse on Banks and Banking, 90, 91, it is said that 'The general control and government of all the affairs and transactions of the bank rest with the board of directors. For such purposes the board constitutes the corporation,' and 'uniform usage imposes upon them the general superintendence and active management of the corporate concerns. They are bound to know what is done, beyond the merest matter of daily routine, and they are bound to know the system and rules arranged for its doing.' Again, on page 115: 'Whatever knowledge a director has, or ought to have, officially, he has, or will be conclusively presumed at law to have, as a private individual. In any transactions with the bank, either on his own separate account, or where others are so far jointly interested with him that his knowledge is their knowledge, he and his joint contractors will be affected by this knowledge which he has or which he ought, if

he had duly performed his official duties, to have acquired.' *Lyman v. United States Bank,* 12 How. 225."

The transaction in suit considered as an entirety contains peculiar features. In the fall of 1929 this bank wanted new cash in the amount of $46,000. Two resources were presumably open to it. It could borrow on its bills payable, or it could rediscount bills receivable. Either of these methods if adopted would require appropriate entries on its books and the facts would be disclosed on its published statements. It does not clearly appear to what extent the bank had exercised these powers in November, 1929. But on July 10, 1930, after the demand for "feeder loans" was largely over, the record before us discloses that it had bills payable outstanding in the sum of $8,100; rediscounts with the Federal Reserve, $18,139; rediscounts with the Grand Island Clearance Association, $25,000, or a total of $51,239. Its total amount of paid-up capital and surplus was then $66,000.

"The aggregate amount of the rediscounts and bills payable of any corporation transacting a banking business in this state shall at no time exceed the amount of its paid-up capital and surplus. * * * Provided, however * * * any state bank becoming a member of the Federal Reserve system, may * * * have the same privileges as to rediscounts and bills payable with the Federal Reserve banks and may incur liabilities to such banks to the same extent as national banks." Comp. St. 1929, sec. 8-136.

So, too, it is to be remembered in this connection that the total of bills payable and rediscounts appears in the published statements of banks and thus becomes in part the basis of its credit with those who deal with it.

The necessary result of the transaction initiated in November, 1929, is that the bank received $46,000 "new cash." This amount was covered by the directors' individual obligations to third persons, on which the bank paid the interest. The record establishes that the bank received the interest on the notes kept in the directors' individual pouches. It thus profited to the extent of the

difference between the interest paid and the interest so received. Identified by its results the transaction was identical with the rediscount of the $46,000 in notes. At least the entire deal was solely for the benefit of the bank, and in the transaction $46,000 of its good notes was charged with the ultimate extinguishment of the obligations constituting the source from which $46,000 in cash was received. The situation suggests the query that, looking through form to substance, should not this transaction have been reported to the state either as "bills payable" or as "rediscounts," and the further query, is not plaintiff's claim substantially within the words of inhibition contained in the statute last referred to?

But, wholly aside from the questions suggested, while plaintiff orally testified in the presence of the trial court that he at no time authorized the withdrawal of $4,610 in notes from the envelope inscribed with his name, this testimony was met with like positive oral evidence that, though he was not present when the formal action was taken of accepting these notes and incorporating them in the assets of the bank, plaintiff in substance approved this plan and fairly authorized the action taken. The trial court heard this evidence and observed the witnesses as they testified, and thus possessed advantages which this reviewing court does not have.

Unquestionably the plaintiff, in general, knew of the bank examination of April 7 to 9, 1930, and in a general way knew the results, and necessarily must have known that steps were required of the board of directors to remedy the situation. What was actually done was itemized, and the notes claimed by plaintiff were scheduled by date, name of maker, and amount, and formally taken into the assets of the bank. The action taken was formally reported to the state. The records retained in the bank were full, detailed and explicit. Twice thereafter the "bills receivable" of this bank were checked over by its directors as a board of auditors with plaintiff present each time and participating. Twice the statements which

included the notes now claimed by plaintiff were formally unanimously approved. Twice it was expressly certified in reports of the bank to the state that the record of obligations of the bank, as contained in these reports, was complete. Twice as a member of the board of directors, and subsequent to the taking over by the bank of the notes now claimed by plaintiff, plaintiff certified that no other outstanding obligations of the bank existed. And admittedly at both of these times the obligations scheduled, of which plaintiff's certificate formed a part, did not contain the claim now made by plaintiff. On the basis of these reports this bank was permitted to continue business by the state, and on the basis of the published statements required by law, which we may assume were made, depositors permitted their deposits to remain in the bank and also made new deposits.

Under the situation thus presented, this reviewing court, in a trial *de novo,* has reached the conclusion that the judgment of the trial court is in all respects correct, and the same is

AFFIRMED.